UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
                                          :
IN RE: LEHMAN BROTHERS INC.,              :
                                          :
                        Debtor.           :
------------------------------------------X    13 Civ. 5381 (DLC)
                                          :
CARVAL INVESTORS UK LIMITED, as manager   :
of CVF Lux Master S.a.r.l., the assignee  :
of Doral Bank and Doral Financial         :
Corporation, and HUDSON CITY SAVINGS      :
BANK,                                     :
                                          :    OPINION & ORDER
                        Appellants,       :
                                          :
              -v-                         :
                                          :
JAMES W. GIDDENS, as Trustee for the SIPA :
Liquidation of Lehman Brothers Inc.,      :
                                          :
                        Appellee.         :
                                          :
------------------------------------------X
                                          :
FEDERAL DEPOSIT INSURANCE CORPORATION, as :
receiver of Westernbank Puerto Rico,      :    13 Civ. 5964 (DLC)
                                          :
                        Appellant,        :
                                          :
              -v-                         :
                                          :
JAMES W. GIDDENS, as Trustee for the SIPA :
Liquidation of Lehman Brothers Inc.,      :
                                          :
                        Appellee.         :
------------------------------------------X

For appellants CarVal Investors UK Limited, as manager of the
assignee of Doral Bank and Doral Financial Corporation:

Luc A. Despins
Bryan R. Kaplan
Paul Hastings LLP
75 East 55th Street
New York, NY 10022

1

For appellant Hudson City Savings Bank:

Hugh McDonald
Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020

Gene R. Besen
Dentons US LLP
2000 McKinney Avenue, Suite 1900
Dallas, TX 75201

For the Securities Investor Protection Corporation:

Josephine Wang
Kenneth J. Caputo
Securities Investor Protection Corporation
805 15th Street, N.W., Suite 800
Washington, DC 20005

DENISE COTE, District Judge:

Appellants CarVal Investors UK Limited, as manager of CVF Lux Master S.a.r.l., the assignee of Doral Bank and Doral Financial Capital (collectively, "Doral") and Hudson City Savings Bank ("Hudson") move pursuant to 28 U.S.C. § 158(d)(2) for certification to appeal directly to the United States Court of Appeals for the Second Circuit from a July 15, 2013 Order of the bankruptcy court denying them "customer" status under the Securities Investor Protection Act of 1970, 15 U.S.C. § 78aaa et seq. ("SIPA"), with respect to a series of repurchase transactions they had entered into with Lehman Brothers Inc. ("LBI") prior to its bankruptcy.  See In re Lehman Bros. Inc., 492 B.R. 379 (Bankr. S.D.N.Y. 2013) ("Bankruptcy Decision").

The Securities Investor Protection Corporation ("SIPC"), a party in interest to this litigation, opposes the motion.[1]  For the following reasons, the motion for certification is denied.

BACKGROUND

On April 6, 2012, appellee James W. Giddens, as trustee for the liquidation of LBI ("Trustee"), filed a motion in bankruptcy court seeking approval of his decision to deny "customer" status under SIPA for a series of claims filed by Doral, Hudson, and the Federal Deposit Insurance Corporation ("FDIC"), as receiver of Westernbank Puerto Rico (collectively, the "Banks") with respect to security repurchase agreements the Banks had previously entered into with LBI.[2]  In the repurchase agreements at issue (the "Agreements"), the Banks had delivered securities to LBI in exchange for cash, and had simultaneously agreed that LBI would return those securities to the Banks on a specific, future "repurchase date" in exchange for a cash payment from the Banks in the amount that LBI had originally transferred, plus a

---

[1] SIPC is deemed to be a party in interest in all matters arising under a SIPA litigation proceeding, and has "the right to be heard on all such matters."  15 U.S.C. § 78eee(d).

[2] The Trustee's motion to the bankruptcy court was one in a series of similar proceedings brought by the Trustee to advance the process of case administration in the LBI liquidation by seeking judicial approval of his determinations that certain categories of claims do not satisfy the definition of customer claims.

financing charge, or "repo rate."[3]  The securities transferred to
LBI per the Agreements (the "Purchased Securities"), were never
returned to the Banks by LBI, and form the basis of the claims
at issue.

Several aspects of the Agreements are particularly relevant
to the principal dispute between the parties.  The Agreements
were governed by an industry-standard Master Repurchase
Agreement and constituted "bilateral" repurchase arrangements.
In a bilateral repurchase agreement, a seller (here, the Banks)
delivers securities to a buyer (here, LBI), who retains complete
discretion over the use of those assets until they are
transferred back to the seller on the agreed-upon repurchase
date.[4]  Accordingly, when the bilateral Agreements were
initiated, the Banks transferred full legal title of the
Purchased Securities to LBI, and gave LBI discretion to use
those securities in other repurchase agreements, sales,
transfers, pledges, or hypothecations until the repurchase date.

---

[3] While Hudson and Doral often refer to the Agreements as
"reverse" repurchase agreements, the only difference between a
regular and reverse repurchase agreement is one of perspective:
a transaction is a repurchase agreement when viewed from the
seller's side, and a reverse repurchase agreement when viewed
from the buyer's side.

[4] By contrast, in other forms of repurchase arrangements, such as
"safekeeping" or "hold-in-custody" repurchase agreements, the
underlying securities are kept in an internal safekeeping
account by a buyer or seller throughout the duration of the
agreement, and cannot be used by a broker-dealer for its
proprietary business.

LBI did just that.  It established separate accounts for each of the Banks with respect to the Purchased Securities, which would record transaction activities but would not, and did not, hold any of the Purchased Securities in the accounts while the Agreements were open.[5]  Instead, as provided under the bilateral Agreements, LBI used the Purchased Securities for its own purposes, including in repurchase transactions or collateral pledges involving other counterparties.  The Banks, for their part, retained an economic interest in the Purchased Securities, including receiving all coupon interest and redemption payments. The use of DVP accounts did not divest LBI of its obligation to return the Purchased Securities to the Banks on the repurchase date, but it also did not require LBI to retain cash or property in the accounts throughout the term of the Agreement.  As a result, on the date that LBI commenced liquidation proceedings (the "Commencement Date"), the Purchased Securities were not held by LBI, but were in the possession of third parties.

The Bankruptcy Decision affirmed the Trustee's determination that these repurchase Agreements did not entitle the Banks to SIPA "customer" status.  Relying in relevant part on the Second Circuit's decision in In re Bernard L. Madoff Inv.

---

[5] Accounts of this type are referred to as "delivery-versus-payment" ("DVP") accounts, as compared to custodial "safekeeping" accounts, in which LBI would segregate the customer's assets from those securities available for LBI to use in its proprietary business.

Secs. LLC, 654 F.3d 229 (2d Cir. 2011) ("In re Madoff"), the
bankruptcy court recognized that a claimant's "cash or
securities must be entrusted with a broker-dealer in order to
qualify for customer protection under SIPA," and found that
because LBI did not hold any of the Purchased Securities in the
Banks' DVP accounts on the Commencement Date, "the key
possessory elements that are needed to establish entrustment" of
the Banks' securities were absent.  In re Lehman, 492 B.R. at
380, 388.  The Bankruptcy Decision also found unpersuasive the
Banks' reliance on a decision by the bankruptcy court of the
District of New Jersey, Cohen v. Army Moral Support Fund (In re
Bevill, Bresler & Schulman Asset Mgmt. Corp.), 67 B.R. 557, 599
(D.N.J. 1986) ("Bevill Bresler"), and their interpretation of
Congressional intent.

     Hudson and Doral filed a notice of appeal of the Bankruptcy
Decision on August 1, and received the bankruptcy records on
August 9.  On August 12, Hudson and Doral moved this Court to
certify a direct appeal to the Second Circuit pursuant to
15 U.S.C. § 158(d)(2)(A).  At the request of the parties, on
August 14, the Court stayed the briefing schedule of any appeal
on the merits pending a determination of the motion for
certification.  By Stipulation and Order of September 12, the
FDIC indicated that it would neither oppose nor join the instant
motion, but agreed that the Court's decision regarding

certification will apply equally to the FDIC.  SIPC filed
opposition to the motion for certification on August 30; Hudson
and Doral filed a letter in reply on September 6.


DISCUSSION

Section 158(d)(2)(a) provides grounds for a district court
to certify appeal of a bankruptcy court's decision directly to
the Court of Appeals.  The "focus" of the statute is on
certification of appeals that "raise controlling questions of
law, concern matters of public importance, and arise under
circumstances where a prompt, determinative ruling might avoid
needless litigation."  <u>Weber v. United States</u>, 484 F.3d 154, 158
(2d Cir. 2007).[6]  Upon certification from a district or
bankruptcy court, the Court of Appeals may then "in its

---

[6] Section 158(d)(2)(A) states:

The appropriate court of appeals shall have jurisdiction of
appeals described in the first sentence of subsection (a)
if the bankruptcy court, the district court, or the
bankruptcy appellate panel involved, acting on its own
motion or on the request of a party to the judgment, order,
or decree described in such first sentence, or all the
appellants and appellees (if any) acting jointly, certify
that --

(i) the judgment, order, or decree involves a question of
law as to which there is no controlling decision of the
court of appeals for the circuit or of the Supreme Court of
the United States, or involves a matter of public
importance; (ii) the judgment, order, or decree involves a
question of law requiring resolution of conflicting
decisions; or (iii) an immediate appeal from the judgment,
order, or decree may materially advance the progress of the
case or proceeding in which the appeal is taken.

discretion exercise, or decline to exercise, that jurisdiction." Id. at 157.

Direct appeal is most appropriate for cases involving "question[s] of law not heavily dependent on the particular facts of a case, because such questions can often be decided based on an incomplete or ambiguous record." Id. at 158.  By contrast, the Second Circuit has instructed that it would be "reluctant to accept cases for direct appeal when . . . percolation through the district court would cast more light on the issue and facilitate a wise and well-informed decision." Id. at 161.

The issues Hudson and Doral seek to raise on appeal center exclusively on the definition of a "customer" under SPIA.  In essence, the four questions presented by Hudson and Doral for appellate review[7] challenge the Bankruptcy

---

[7] The questions Hudson and Doral seek to raise on appeal are:

   (1)  Did the bankruptcy court err as a matter of law in finding that the [Banks'] claims arising from repurchase agreements are not entitled to customer status under SIPA?

   (2)  Did the bankruptcy court err in determining that "actual possession" of a claimant's securities by the broker-dealer on the commencement date of the SIPA proceeding is required for the claimant to be entitled to customer status?

   (3)  Did the bankruptcy court err in finding that [In re Bevill, Bresler & Schulman Asset Mgmt. Corp., 67 B.R. 557 (D.N.J. 1986)] is "entirely distinguishable" from the instant matter because certain transactions in Bevill Bresler that were subject to repurchase transactions, as

Decision's interpretation of the "entrustment" requirement
for customer claims under SIPA as too narrow, and suggest
that the Bankruptcy Decision overlooked both relevant case
law from other bankruptcy courts and Congressional intent
indicating that claims arising from the types of repurchase
arrangements at issue here are entitled to customer status.

In seeking certification of direct appeal on these
issues, Hudson and Doral argue that all the elements of
Section 158(d)(2)(A) are met.  Each element -- whether a
controlling decision exists; whether the appeal involves a
question of law requiring resolution of conflicting
decisions; whether the appeal involves a matter of public
importance; and whether an immediate appeal would
materially advance the progress of the case -- will be
addressed in turn.  None of these grounds for direct appeal
is satisfied here.

---

opposed to reverse repurchase transactions such as those
at issue in the instant matter, involved the
"safekeeping" or "holding-in-custody" of securities? and

(4)  Did the bankruptcy court err in failing to consider the
fact that claims based on reverse repos were carved out
of the definition of "customer" in Section 741 of Title
11 of the United States Code through the Dodd-Frank Act,
and the fact that Congress did not amend the definition
of "customer" under SIPA to include the same carve out?

A.  Controlling Decision

Hudson and Doral contend that there is no controlling decision by the Second Circuit or the Supreme Court addressing whether repurchase agreements give rise to SIPA customer claims.  But the Second Circuit has addressed the central issue of this appeal -- the criteria for "customer" status as defined by SIPA –- on several occasions.  It has repeatedly made clear that "the critical aspect of the 'customer' definition is the entrustment of cash or securities to the broker-dealer for the purposes of trading securities," In re Madoff, 654 F.3d at 236 (citation omitted); see also Secs. and Exch. Comm'n v. F. O. Baroff Co., 497 F.2d 280, 283 (2d Cir. 1974) (recognizing that SIPA was intended to protect the "customer who has entrusted securities to a broker for some purpose connected with participation in the securities markets."), and has instructed that "[j]udicial interpretations of 'customer' status support a narrow interpretation of . . . SIPA's provisions."  In re New Times Sec. Servs., Inc., 463 F.3d 125, 127 (2d Cir. 2006) (citation omitted).

It has held that a claimant may be a "customer" under SIPA "with respect to some of his claims for cash or shares, but not with respect to others," id. (citation omitted), and stressed the importance of the purpose of the

10

transaction at issue in determining which claimants achieve customer status.  See id. at 128 (SIPA "distinguishes between (i) claimants (protected as customers) who are engaged through brokers in trading activities in the securities markets and (ii) those (unprotected) claimants who are relying on the ability of a business enterprise to repay a loan.").  In this regard, "[c]ustomers" are only those claimants who entrust cash or securities to a broker through an agreement that "bear[s] the indicia of the fiduciary relationship between a broker and his public customer" and not of "an ordinary debtor-creditor relationship."  Secs. Investor Prot. Corp. v. Exec. Secs. Corp., 556 F.2d 98, 99 (2d Cir. 1977) (per curium) (citation omitted).

Contrary to Hudson and Doral's contention, the Second Circuit has analyzed this buyer-seller relationship in the express context of repurchase agreements, recognizing that a claimant who "t[ook] [a] circuitous route of lending securities with permission to hypothecate so as to enable the broker to obtain cash, would obviously be outside of [SIPA's] definition of 'customers' which covers cash deposits only if they are for the purpose of purchasing securities." Baroff, 497 F.2d at 284.  The Second Circuit has also referred to the need to analyze claims in relation

11

to the date a debtor liquidation is filed when determining "customer" status, see New Times, 463 F.3d at 128-29, and has repeatedly provided guidance as to its understanding of Congress's intent in crafting the definition of a customer under SIPA.   See, e.g., In re Madoff, 654 F.3d at 236; New Times, 463 F.3d at 128; Executive Secs. Corp., 556 F.2d at 99.

Hudson and Doral make no argument as to why these decisions by the Second Circuit are not controlling on the issues presented for appeal.   Moreover, the questions of whether the repurchase arrangement entered into under the Agreements fits the definition of "customer" status articulated in the Second Circuit cases described above, and whether the Banks "entrusted" securities to LBI such that customer status applies, are inquiries "heavily dependent on the particular facts of [this] case," Weber, 484 F.3d at 158, which must be examined in light of the decisions referenced above, and are thus inappropriate for direct appeal.

   B. Question of Law Requiring Resolution of Conflicting
      Decisions

Hudson and Doral also contend that the Bankruptcy Decision contradicts "decades of precedent" finding that repurchase agreements give rise to customer claims, as

articulated in a decision from the District of New Jersey,
Bevill Bresler, 67 B.R. 557, and its progeny.  In
particular, Hudson and Doral argue (i) that the Bankruptcy
Decision created confusion by improperly distinguishing the
repurchase agreements in Bevill Bresler from those in the
present case; and (ii) that, in light of the Bankruptcy
Decision, a conflict now exists among bankruptcy courts as
to whether the ability of a broker-dealer to hypothecate
purchased securities destroys customer status under SIPA.

Neither of these purported "conflicts," however,
raises a question of law requiring resolution by direct
appeal.  First, Hudson and Doral's contentions regarding
the Bankruptcy Decision's characterization of the
repurchase agreements in Bevill Bresler as "entirely
distinguishable" from those in the present case is a
question of fact, not of law, and does not render direct
appeal necessary.  In addition, exploration of each of the
conflicts to which movants point would benefit from
allowing the "case[] to percolate through the normal
channels" of a district court's examination of the
particular facts of the case under the controlling law.
Weber, 484 F.3d at 160.

C.  Matter of Public Importance

Hudson and Doral argue that this appeal involves a matter of public importance because any decision affecting the enforcement remedies available to parties to repurchase agreements will have an impact on the "repo and larger securities market" in the United States.  In particular, they argue that Bevill Bresler and its progeny had induced reliance that repurchase market participants would enjoy the protections of "customers" under SIPA in the event of a broker-dealer liquidation, and the Bankruptcy Decision threatens the stability that those participants feel.

Aside from their broad assertion that the repurchase market is a "critical" component of the United States and global capital markets, a proposition with which the SIPC does not disagree, Hudson and Doral do not explain how the resolution of these issues through certification of a direct appeal would advance the development of the law to an unusual degree, or impact the public at large.  See 1 Collier on Bankruptcy ¶ 5.06[5][b] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010) (recognizing that this condition was intended to expedite appeals that "transcend the litigants and involve a legal question the resolution of which will advance the cause of jurisprudence to a degree that is usually not the case," and that "[t]he bar

for certification under this standard should be set
high."). Accordingly, direct appeal is not appropriate on
the basis that this appeal involves a matter of public
importance.

D. Material Advancement of the Case

Finally, Hudson and Doral argue that direct appeal would
materially advance the progress of this case because of the
"inevitable Second Circuit review of this matter." But if the
mere expectation of advancement to a circuit court was
sufficient to establish material advancement, Section
158(d)(2)(A) would effectively eliminate the district court from
the bankruptcy review process altogether. The Second Circuit
has recognized the "dangers of leapfrogging the district court
in the appeals process" and the Congressional concern for those
dangers during the enactment of the Section. Weber, 484 F.3d at
160. As it instructed, "[Congress] did not wish . . . to
privilege speed over other goals; indeed, speed is not
necessarily compatible with our ultimate objective -- answering
questions wisely and well." Id. Here, the Bankruptcy Decision
is not "either manifestly correct or incorrect," and it is not
clear that certification of direct appeal would materially
advance the case. Id. at 161.

Moreover, "district courts tend to resolve bankruptcy
appeals faster than the courts of appeals," and as a result,

"the cost in speed of permitting district court review will likely be small." Id. at 160.  Any small cost in speed that an appeal from bankruptcy court to the district court imposes on the advancement of this litigation may be remedied in part by setting an efficient briefing schedule for briefing the appeal.

CONCLUSION

Hudson and Doral's August 12, 2013 motion for certification of direct appeal to the Second Circuit Court of Appeals is denied.  A scheduling order will follow to set a briefing schedule for any merits appeal of the Bankruptcy Decision to the Court.

SO ORDERED:

Dated:      New York, New York
            September 18, 2013

_____
                DENISE COTE
        United States District Judge